## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

RON YUSNUKIS,

        Plaintiff,

v.                                                                                    No. 1:24-cv-0355 SMD/JFR

NEVRO CORPORATION,

        Defendant.

### <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** is before the Court on Defendant Nevro Corporation's ("Nevro") Motion to Dismiss Plaintiff's First Amended Complaint ("FAC").  Doc. 16 ("Def.'s Mot. to Dismiss"). Plaintiff filed his response, and Defendant filed its reply.  Doc. 18 ("Pl.'s Resp."); Doc. 19 ("Def.'s Reply").  Plaintiff Ron Yusnukis asserts seven claims arising from injuries allegedly caused by Nevro's medical device.  Nevro argues that the claims are preempted by the Medical Device Amendments and otherwise fail to state plausible claims for relief.  For the reasons explained below, Plaintiff's claims are preempted in part and otherwise not plausibly pled.  The Court will therefore **GRANT** the Motion.

### BACKGROUND

In March 2021, Plaintiff Ron Yusnukis was introduced to a sales representative for Nevro, a corporation that designs, manufactures, and sells spinal cord stimulator ("SCS") devices.[1]  FAC ¶¶ 48, 71.  Plaintiff subsequently underwent a trial spinal cord stimulation procedure in which

---

[1] A spinal cord stimulator is a surgically implanted device used to help manage chronic pain.  It consists of a small generator placed under the skin and thin wires positioned near the spinal cord.  The generator sends mild electrical impulses that interfere with pain signals before they reach the brain.  The patient or a healthcare provider can adjust the stimulation with a handheld remote.  The stimulation therapy is intended for long-term pain in the back, legs, or other areas when conventional treatments have not provided relief.  U.S. Food & Drug Admin., *Senza Spinal Cord Stimulation System – P130022/S039*, https://www.fda.gov/medical-devices/recently-approved-devices/senza-spinal-cord-stimulation-system-p130022s039 (last visited Jan. 6, 2026).

temporary leads were implanted, after which he "reported significant reduction in his lower back pain." *Id.* ¶¶ 73–74.  Shortly thereafter, Plaintiff's physician implanted a permanent Nevro Omnia SCS into Plaintiff.  *Id.* ¶ 77.  The Omnia device is a rechargeable spinal cord stimulator consisting of an implanted pulse generator and percutaneous leads, designed to deliver electrical impulses to the spinal cord to modulate pain signals.  *Id.* ¶¶ 48–52.

Plaintiff alleges that the device failed to provide the promised therapeutic benefits and instead caused him severe, life-altering injuries, including syncopal episodes and incontinence,[2] which persisted until the device was explanted after 49 days.  FAC ¶¶ 78–80; *see also* Pl.'s Resp. at 2.

On April 12, 2024, Plaintiff filed his original Complaint.  Doc. 1.  On August 13, 2024, he filed his FAC, which is the operative pleading.  FAC.  Plaintiff asserts seven causes of action.  *Id.* at 33–41.

In Count I (Manufacturing Defect), Plaintiff alleges that Nevro's HFX Omnia Spinal Cord Stimulation System (HFX) implants were in a defective condition at the time of sale, deviated from FDA-approved specifications, and caused his injuries.  *See id.* ¶¶ 173–83.  He contends that Nevro's manufacturing defect violated both state law and parallel federal post-approval requirements.  *Id.* ¶¶ 182–83.

In Count II (Breach of Implied Warranties), Plaintiff alleges that Nevro sold its HFX implants in a defective condition, knew the devices were being purchased for chronic pain

---

[2] Syncope is a:

> Partial or complete loss of consciousness with interruption of awareness of oneself and one's surroundings.  When the loss of consciousness is temporary and there is spontaneous recovery, it is referred to as syncope or, in nonmedical quarters, fainting.  Syncope is due to a temporary reduction in blood flow and therefore a shortage of oxygen to the brain.  This leads to lightheadedness or a 'black out' episode, a loss of consciousness.

*Definition of Syncope*, RxLIST, https://www.rxlist.com/syncope/definition.htm (last visited Jan. 6, 2026).

management, and breached implied warranties of merchantability and fitness for a particular purpose. *See id.* ¶¶ 184–94. He claims the implants were not fit for their ordinary use and that he and his physician relied on Nevro's implied warranties. *Id.* ¶¶ 191–93.

In Count III (Failure to Warn), Plaintiff alleges that Nevro failed to provide adequate warnings to his physician regarding known risks of the HFX implants, including syncopal episodes and incontinence. *See id.* ¶¶ 195–204. He asserts that Nevro's failure to provide FDA-approved labeling or other warnings violated both federal law and parallel state duties. *Id.* ¶¶ 197–99.

In Count IV (Negligence – Product Liability), Plaintiff alleges that Nevro failed to comply with FDA manufacturing regulations, including requirements for quality audits, risk analysis, process monitoring, and corrective actions. *See id.* ¶¶ 205–13. He contends these failures proximately caused his injuries. *Id.* ¶ 208.

In Count V (Fraudulent Misrepresentation), Plaintiff alleges that Nevro and its sales representatives made multiple factual misrepresentations regarding the safety, efficacy, and properties of the HFX device, knowing those statements were false or reckless. *See id.* ¶¶ 217–22. He claims he relied on these misrepresentations in consenting to implantation, which caused his injuries. *Id.* ¶¶ 221–22.

In Count VI (Breach of Express Warranties), Plaintiff alleges that Nevro expressly warranted through its representatives and marketing materials that the HFX device was safe, fit for use, and free of dangerous side effects. *See id.* ¶¶ 223–33. He contends the device did not conform to these warranties, did not deliver the claimed results, and caused severe injury. *Id.* ¶¶ 226–28, 232.

Finally, in Count VII (Violation of the New Mexico Unfair Practices Act), Plaintiff alleges that Nevro made false or misleading representations in connection with the sale of its HFX

implants in the regular course of trade or commerce, which tended to deceive or mislead consumers. *See id.* ¶¶ 234–38.

On October 7, 2024, Nevro moved to dismiss the FAC under Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiff's claims are preempted by the Medical Device Amendments to the Food, Drug, and Cosmetic Act, 21 U.S.C. § 360k(a), and otherwise fail to state plausible claims for relief. *See* Def.'s Mot. to Dismiss. The motion is now fully briefed and ready for decision.

## LEGAL STANDARDS

In 1976, Congress passed the Medical Device Amendments to the Federal Food, Drug, and Cosmetic Act ("MDA"), imposing a detailed federal oversight regime for medical devices, including various levels of oversight depending on the risk level of a given device. *See Riegel v. Medtronic, Inc.*, 552 U.S. 312, 316 (2008). Under the MDA, Class I devices are subject to the lowest level of oversight; Class III devices are subject to the highest. *Id.* at 316–17; *see also* 21 U.S.C. § 360c(a). The MDA also established a rigorous premarket approval ("PMA") process for Class III devices, which entails an average of 1,200 hours of time on the part of the FDA to review each application. *Riegel*, 552 U.S. at 318. The process requires that the FDA find "reasonable assurance" of a given Class III device's "safety and effectiveness," but allows the FDA to nonetheless "approve devices that present great risks if they . . . offer great benefits in light of available alternatives." *Id.* (quoting 21 U.S.C. § 360e(d)). The PMA process includes review of a device's proposed labeling and may be conditional on adherence to certain performance standards or other restrictions. *Id.* at 318–19. After PMA, Class III devices are subject to reporting requirements, and the FDA has the power to withdraw approval based on new data. *Id.* at 319–20 (citing §§ 360e(e)(1), 360h(e)). "Once a device has received premarket approval, the MDA forbids

the manufacturer to make, without FDA permission, changes in design specifications, manufacturing processes, labeling, or any other attribute, that would affect safety or effectiveness." *Id.* at 319 (citing § 360e(d)(6)(A)(i)).

Manufacturers are also subject to post-PMA reporting requirements that include a manufacturer's obligation to inform the FDA of new clinical investigations or scientific studies, 21 C.F.R. § 814.84(b)(2), report incidents in which the device "[m]ay have caused or contributed to a death or serious injury[,]" or report device malfunctions that would likely cause or contribute to death or serious injury, 21 C.F.R. § 803.50(a).  Based on these reports or other existing information, the FDA must withdraw a device's PMA if it is unsafe or ineffective under the conditions of its approval.  *See* 21 U.S.C. §§ 360e(e)(1)(A), 360h(e); *Riegel*, 552 U.S. at 319–20.  Once a Class III device is approved via the PMA process, it may then be sold to consumers.  *See generally* 21 C.F.R. § 814.82(a); U.S. Food & Drug Admin., *Premarket Approval (PMA)* (May 16, 2019), https://www.fda.gov/medical-devices/premarket-submissions-selecting-and-preparing-correct-submission/premarket-approval-pma.

"Congress created no private cause of action in the MDA . . . ."  *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1280 (10th Cir. 2021).  Indeed, "the statute preempts *any* effort to use state law to impose a new requirement on a [device that has already been approved by the FDA.]" *Caplinger v. Medtronic, Inc.*, 784 F.3d 1335, 1344 (10th Cir. 2015).  The MDA includes an express preemption provision, which states:

> Except as provided in subsection (b), no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—
>
> (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and
>
> (2) which relates to the safety or effectiveness of the device or to any other matter

5

included in a requirement applicable to the device under this chapter.

21 U.S.C. § 360k(a).  The MDA also states that—except for those actions brought by states themselves—all "proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States."  21 U.S.C. § 337(a); *see also* § 337(b)(1).  State tort suits are not always preempted by the MDA, but to survive, state law must impose "parallel" duties to those found in the federal regulations.  *Caplinger*, 784 F.3d at 1338 (construing *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996)).

The introduction of federal law into the realm of medical devices has thus left, "by both express and implied preemption, only a narrow gap within which a plaintiff can plead a tort claim arising from the failure of a medical device."  *Brooks*, 985 F.3d at 1276.  That is, "to survive preemption, a plaintiff must plead conduct that (1) violates the [Federal Food, Drug, and Cosmetic Act ("FDCA")] (because state law may not impose additional or different duties) and (2) would be actionable under state law independently of the FDCA (because a plaintiff may not seek to enforce the FDCA)."  *Id.* at 1279.  Where a plaintiff misses this narrow gap, the claim is preempted and subject to dismissal.  *Id.*

As to pleading, pursuant to Rule 12(b)(6), a party may move for dismissal if the complaint fails "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This pleading standard does not impose a probability requirement, but it demands "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not suffice.  *Twombly*, 550 U.S. at 555.  Although the court

must accept the truth of all properly alleged facts and draw all reasonable inferences in the plaintiff's favor, the plaintiff still "must nudge the claim across the line from conceivable or speculative to plausible." *Brooks*, 985 F.3d at 1281.

## DISCUSSION

Defendant Nevro moves to dismiss all seven causes of action alleged in Plaintiff's FAC—manufacturing defect, breach of implied warranties, failure to warn, negligence, fraudulent misrepresentation, breach of express warranties, and violation of the New Mexico Unfair Practices Act—on the grounds that they are either expressly preempted by 21 U.S.C. § 360k(a) or insufficiently pled under Federal Rules of Civil Procedure 12(b)(6) and 8. *See* Def.'s Mot. to Dismiss at 2–3, 8. Plaintiff, in response, maintains that his claims rest on state-law duties that parallel federal requirements, that Nevro's device deviated from FDA-approved specifications, and that Nevro's failure to warn and misrepresentations directly caused his injuries. *See* Pl.'s Resp. The Court will address each claim in turn.

### I.   Judicial Notice

As an initial matter, Nevro requests that the Court take judicial notice of FDA records confirming premarket approval for the Senza System in 2015 and supplemental PMA approval for the Omnia device in 2019. *See* Def.'s Mot. to Dismiss at 4 n.3. Courts may take judicial notice of official government publications, including publicly available FDA approval records, because their accuracy cannot reasonably be questioned. *See* Fed. R. Evid. 201(b)(2); *High Desert Relief, Inc. v. United States*, 917 F.3d 1170, 1175 n.1 (10th Cir. 2019); *Suttman-Villars v. Argon Med. Devices, Inc.*, 553 F. Supp. 3d 946, 952–53 (D.N.M. 2021). Plaintiff does not address judicial notice in his response brief, and the request therefore appears unopposed. The Court therefore takes judicial notice of these records for the fact of approval, not for the truth of any underlying

statements.  The FDA's PMA records for the Senza System, including the original 2015 approval (P130022) and multiple supplemental approvals issued thereafter, are publicly available on the FDA's PMA database at https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfpma/pma.cfm?id =P130022.

Nevro also requests judicial notice of the warnings, precautions, and adverse-event information contained in the FDA-approved labeling for the SCS System.  Def.'s Mot. to Dismiss at 11 n.6. Judicial notice is not appropriate for this purpose.  Courts may notice the existence of publicly available documents, but not the truth of the matters asserted within them.  *See Nowell v. Medtronic Inc.*, 372 F. Supp. 3d 1166, 1207–08 (D.N.M. 2019), *aff'd*, 2021 WL 4979300 (10th Cir. Oct. 27, 2021); *Oliver v. Meow Wolf, Inc.*, No. 1:20-cv-0237, 2021 WL 4171574, at *2 (D.N.M. May 17, 2021); *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006).  Although the FDA-approved labeling for the Senza System is publicly available on the FDA's PMA database, the content of the labeling is not necessary to resolve the present motion, and the Court therefore declines to take judicial notice of the labeling materials.  The Court may later reference the labeling for the limited purpose of identifying which warnings appear and which do not, but not for the truth of any medical assertions contained therein.

## II.    Count I – Manufacturing Defect

In Count I, Plaintiff alleges that Nevro's SCS System was unreasonably dangerous because its percutaneous leads deviated from FDA-approved specifications by exhibiting impedance values greater than 18 Ohms.[3]   *See* FAC ¶¶ 7–9, 178–79.  Plaintiff claims this deviation caused

---

[3] Percutaneous leads are thin insulated wires inserted through the skin to deliver electrical stimulation from the spinal cord stimulation system.  *See generally*, *Spinal Cord Simulator*, CLEVELAND CLINIC, https://my.clevelandclinic.org /health/treatments/24237-spinal-cord-stimulator-scs (last visited Jan. 7, 2026).

Plaintiff contends that these leads showed electrical resistance (impedance) above the FDA-approved threshold of 18 Ohms.  The ohm ($\Omega$) is the standard unit of electrical resistance.  *See Ohm*, ENCYCLOPEDIA BRITANNICA, https://www.britannica.com/science/ohm (last visited Jan. 7, 2026).

overstimulation of his vagus nerve, resulting in syncopal episodes, vertigo, and fecal incontinence. *See id.* ¶¶ 55, 79–80, 83.    Plaintiff's manufacturing-defect claim is both preempted and inadequately pled.

The Court begins with preemption, because the parties' briefing focuses primarily on whether Plaintiff's manufacturing-defect theory survives the MDA's express and implied preemption framework.

a.    Federal preemption under the MDA

The Supreme Court has set out a two-step test for deciding if a claim is expressly preempted. *Riegel*, 552 U.S. at 321–22.    First, the Court looks to see if the FDA has set any requirements for the device in question. *Id.* at 321.    If it has, then the Court must determine whether the plaintiff's state-law claims deal with the device's safety or effectiveness, and whether those claims add to or differ from the federal requirements under the MDA. *Id.* at 322–23.    As long as the duties imposed by state law "parallel" the duties in the FDCA, they do not create new obligations for manufacturers. *Lohr*, 518 U.S. at 495.    A state law is "parallel" when it is either identical to federal law or when the elements of the state law cause of action "make the state requirements narrower, not broader, than the federal requirement." *Id.*

Implied preemption works differently.    It comes from the statute's language that "all such proceedings for the enforcement, or to restrain violations, of [Chapter 9 of the FDCA] shall be by and in the name of the United States."    21 U.S.C. § 337(a).    In *Buckman Co. v. Plaintiffs' Legal Committee*, the Court explained that "the FDCA leaves no doubt that it is the Federal Government rather than private litigants who [is] authorized to file suit for noncompliance with the medical device provisions . . . ."    *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.4 (citing 21 U.S.C. § 337(a)).    Thus, a plaintiff cannot bring a tort claim that exists "solely by virtue" of an

9

FDCA violation. *Id.* at 353.  Instead, the claim must rest on traditional state tort law, even if the conduct also violates the FDCA.  *Brooks*, 985 F.3d at 1279 ("Any such claim must be predicated on conduct that violates the FDCA but may not be brought solely because that conduct violates the FDCA—the conduct must also violate a parallel state-law requirement") (emphasis omitted).

"The MDA's express and implied preemption rules leave 'only a narrow gap within which a plaintiff can plead a tort claim arising from the failure of a medical device.'" *Ferguson v. Bayer Essure, Inc.*, No. 2:21-cv-0664 MLG/GBW, 2023 WL 6377495, at *4 (D.N.M. Sept. 29, 2023) (quoting *Brooks*, 985 F.3d at 1276).  As the Eighth Circuit put it, "[t]he plaintiff must be suing *for* conduct that violates the FDCA (or else his claim is expressly preempted by § 360k(a)), but the plaintiff must not be suing *because* the conduct violates the FDCA (such a claim would be impliedly preempted under *Buckman*)." *Id.* (quoting *In re: Medtronic, Inc., Sprint Fidelis Leads Prods. Liab. Litig.*, 623 F.3d 1200, 1204 (8th Cir. 2010)).  When a claim falls outside that narrow gap, "the court should dismiss that claim." *Brooks*, 985 F.3d at 1279.

     b.     <u>Express and implied preemption</u>

Defendants argue Plaintiff's manufacturing defect claim is barred by both express and implied preemption.  *See* Def.'s Mot. to Dismiss at 12–14; Def.'s Reply at 1–6.  The Court agrees in part.

Under *Riegel*, the Court first asks whether the FDA has established requirements for the device.  *See Riegel*, 552 U.S. at 321.  Here, the Senza System received PMA in 2015 and supplemental PMA in 2019.[4]  *See* Def.'s Reply at 2.  Federal requirements therefore apply.  Second, the Court considers whether Plaintiff's state-law claim imposes requirements "different from, or in addition to" those federal requirements.  *See Riegel*, 552 U.S. at 322–23.  To the extent

---

[4] As discussed above, the Court takes judicial notice of the FDA's PMA approval records solely for the fact of approval.  *See* Section I.

10

Plaintiff challenges the FDA-approved design itself, his claim is expressly preempted under § 360k(a).

Plaintiff responds that Nevro failed to disclose the HFC Connect Module to the FDA. *See* Pl.'s Resp. at 7–9. Count I, however, does not rely on this allegation, and even if it did, claims premised on nondisclosure or misrepresentation to the FDA are "fraud-on-the-FDA" claims, which the Supreme Court has held are impliedly preempted. *See Buckman*, 531 U.S. at 342, 349–51 (explaining that fraud-on-the-FDA claims "inevitably conflict with the FDA's responsibility to police fraud consistently with the Administration's judgment and objectives"). Enforcement of FDCA compliance rests solely with the federal government, not private litigants. *See id.* at 349 n.4. Plaintiff therefore cannot avoid preemption by challenging the FDA's approval process.

      c.      <u>Parallel claims</u>

The Court next considers whether Plaintiff has pled a "parallel claim" that survives preemption. A manufacturing-defect claim may fit within the "narrow gap" recognized in *Brooks*, if it alleges that the device deviated from federally mandated specifications and that the deviation caused the plaintiff's injuries. *See Brooks*, 985 F.3d at 1279 (explaining that a state-law claim survives preemption if it alleges conduct that violates the FDCA and would also be independently actionable under state law). However, the FAC does not plausibly allege such a claim.

Plaintiff alleges that Nevro's device deviated from specifications because its leads exhibited impedance values above 18 Ohms. *See* FAC ¶¶ 7–9, 178–79. He further alleges that overstimulation of the vagus nerve can cause dysmotility, syncope, arrhythmias, and incontinence. *Id.* ¶¶ 55–56. These allegations identify a purported deviation and a mechanism of injury, but they do not plausibly connect the two. The paragraphs describe how overstimulation can produce the injuries Plaintiff experienced, but they do not allege facts showing how the purported

manufacturing deviation—impedance above 18 Ohms—caused that overstimulation.

Nevro disputes Plaintiff's causation theory, s*ee* Def.'s Mot. to Dismiss at 12–14, but the Court does not resolve scientific disputes at the Rule 12(b)(6) stage. Instead, the question is whether the FAC itself alleges facts showing how the purported deviation—elevated impedance—caused the injuries Plaintiff describes. It does not.

Plaintiff attempts in his response brief to distinguish "overstimulation" from "insult," arguing that elevated impedance produces heat and that the FAC's references to "shocking" and "burning" events, FAC ¶¶ 7–23, support an inference of thermal injury. *See* Pl.'s Resp. at 10–11. But the FAC alleges only electrical overstimulation of the vagus nerve, not thermal injury, burns, or tissue damage, and Plaintiff cannot amend the complaint through briefing.

Thus, even accepting Plaintiff's factual allegations as true, the FAC does not plausibly allege: what FDA-approved specification required impedance at or below 18 Ohms, how Plaintiff's device departed from that specification beyond a conclusory reference to impedance readings, or how that departure caused the overstimulation described in the FAC ¶¶ 55–56. As in *Ferguson*, where the plaintiff failed to allege *how* "non-conforming material" caused her injuries, Plaintiff here fails to allege facts showing that elevated impedance caused thermal injury or the injuries he describes. *See Ferguson*, 2023 WL 6377495, at *8.

Because Plaintiff's manufacturing-defect claim challenges the FDA-approved design to the extent it relies on design-change or nondisclosure theories, it is expressly and impliedly preempted. To the extent Plaintiff attempts to assert a parallel manufacturing-defect claim, the FAC does not plausibly allege facts showing how the purported deviation caused his injuries. Count I is therefore dismissed without prejudice.

### III.     Count II – Breach of Implied Warranties

In Count II, Plaintiff alleges Nevro breached the implied warranties of merchantability and fitness for a particular purpose because the SCS System was not fit for its ordinary use (pain management) and was unreasonably dangerous. *See* FAC ¶¶ 186–94.  Plaintiff's implied-warranty claims are preempted and inadequately pled.

The MDA's express and implied preemption framework analysis applies equally to these implied warranty claims.  Courts consistently hold that implied warranty claims premised on dangerousness or ineffectiveness are preempted because they would require altering a PMA-approved design or labeling contrary to federal law.  *See Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1288–90 (10th Cir. 2013) (finding that warranty claims alleging a drug was "unfit" or "unreasonably dangerous" were preempted because they would require changing its FDA-mandated composition or labeling); *see also Parker v. Stryker Corp.*, 584 F. Supp. 2d 1298, 1301–02 (D. Colo. 2008) (dismissing implied warranty claims where the complaint alleged only that the device was "unreasonably dangerous" without factual detail showing deviation from PMA specifications).  Warranty claims survive only if they allege a true "parallel claim"—a deviation from FDA specifications that rendered the device unfit for its ordinary purpose.  *See e.g.*, *Caplinger*, 784 F.3d at 1342 n.3 (rejecting warranty claims where the complaint contained only conclusory allegations and failed to plead facts establishing a defect); *Ferguson v. Bayer Essure, Inc.*, No. 2:21-cv-0664, MLG/GBW, 2023 WL 6377495, at *9 (D.N.M. Sept. 29, 2023) (dismissing warranty claims because plaintiff failed to connect alleged manufacturing irregularities to her injuries).

Plaintiff's implied warranty claims fall outside the narrow gap left open by the MDA.  The FAC asserts in general terms that the SCS System was "unreasonably dangerous" and "not fit for

its ordinary purpose." FAC ¶¶ 165, 186–94. Although the FAC contains paragraphs (¶¶ 7–9) that appear to reference impedance values and purported performance standards, neither party cites nor relies on those allegations in briefing the implied-warranty claims. Even if the Court were to consider those paragraphs, they do not identify any FDA-approved specification requiring impedance below 18 Ohms, nor do they explain how Plaintiff's device deviated from such a specification or how any deviation rendered the device unfit. As in *Parker* and *Caplinger* where warranty claims were rejected for lacking details showing deviation from PMA standards, conclusory allegations of dangerousness are insufficient and the FAC lacks factual detail to support either merchantability or fitness claims.

To the extent Plaintiff challenges the FDA-approved design or labeling, his claims are expressly preempted under § 360k(a). To the extent he alleges nondisclosure or misrepresentation to FDA, they are impliedly preempted under *Buckman Co.*, as explained in the analysis under Count I.

Even apart from preemption, the FAC does not plausibly allege the elements of a claim for breach of the implied warranties of merchantability or fitness for a particular purpose as explained below.

    a.    <u>Merchantability</u>

Under New Mexico law, to establish a claim for breach of the implied warranty of merchantability, a plaintiff must prove that the seller sold goods or products that failed to meet the statutory definition of merchantable, which is that the goods "are fit for the ordinary purposes for which such goods are used . . . ." *See Am. Mech. Sols., L.L.C. v. Northland Process Piping, Inc.*, 184 F. Supp. 3d 1030, 1059 (D.N.M. 2016) (citing N.M. Stat. Ann. § 55-2-314(2)(c)). "A breach of the implied warranty of merchantability claim 'thus requires proof of a defect.'" *Id.* at 1060.

14

Plaintiff has not plausibly alleged such a defect.

Plaintiff alleges that the SCS System was unfit for its ordinary purpose of pain management because it was "unreasonably dangerous." *See* FAC ¶¶ 165, 185–94.  However, the FAC does not identify any defect that rendered the device unfit for its ordinary purpose.  General references to impedance values, like in FAC ¶¶ 7–9, do not allege a deviation from any FDA-approved specification or otherwise establish a defect.  As in *Parker* and *Caplinger*, generalized allegations that a PMA-approved device was "unreasonably dangerous" do not plausibly allege a defect.  Courts in this district have dismissed similar claims where the complaint offered only "vague allegations and the hope that discovery eventually will reveal some basis" for a warranty theory, rather than factual allegations establishing the elements of fitness or merchantability.  *See Nowell*, 372 F. Supp. 3d at 1257–58.

Because Plaintiff has not alleged facts showing that the SCS System contained a defect that rendered it unfit for its ordinary purpose, the implied warranty of merchantability is not plausibly pled.

> b.      Fitness for a Particular Purpose

The requirements to establish a breach of the implied warranty of fitness for a particular purpose is distinct from merchantability: it concerns a particular use known to the seller, not the product's ordinary purpose.  Given its requirements, Plaintiff's fitness for a particular purpose claim is not plausibly pled.

Under New Mexico law, "to establish a breach of the implied warranty of fitness for a particular purpose, a plaintiff must prove (i) that, at the time of contracting, the seller had reason to know the buyer's particular purpose for which the item was being ordered; (ii) that the buyer relied upon the seller's skill or judgment; and (iii) that the item was not fit for that purpose." *See*

*Bellman v. NXP Semiconductors USA, Inc.*, 248 F. Supp. 3d 1081, 1153–54 (D.N.M. 2017) (citing *Lieb v. Milne*, 625 P.2d 1233, 1237 (N.M. Ct. App. 1980)); *see also* N.M. Stat. Ann. § 55-2-315. "Normally the warranty will arise only where the seller is a merchant with the appropriate 'skill or judgment,'" although "it can arise as to non-merchants where this is justified by the particular circumstances." N.M. Stat. Ann. § 55-2-315 cmt. 4. The UCC defines "merchant" as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction . . . ." N.M. Stat. Ann. § 55-2-104(1).

The FAC does not allege that Nevro knew of any particular purpose beyond the device's ordinary indication of pain management. *See* FAC ¶¶ 185–94. In his response brief, Plaintiff argues that Nevro must have known the device was intended for chronic pain because that indication appears in the FDA approval letter submitted by Nevro, *see* Def.'s Mot. to Dismiss at 23, and in the device's patient manual, *see* Def.'s Mot. to Dismiss at 33. *See* Pl.'s Resp. at 14. But identifying the device's ordinary, intended use does not establish a different or special purpose that could support a fitness for a particular purpose claim. The Tenth Circuit has noted that "the statute distinguishes between an ordinary purpose giving rise to an implied warranty of merchantability and a particular purpose giving rise to an implied warranty of fitness for a particular purpose." *Crysco Oilfield Serv., Inc. v. Hutchison-Hayes Int'l, Inc.*, 913 F.2d 850, 852 (10th Cir. 1990) (quoting *Weir v. Fed. Ins. Co.*, 811 F.2d 1387, 1393 (10th Cir. 1987)). It has rejected the view that a fitness warranty may arise when the buyer's intended use is the same as the general use to which the goods are ordinarily put. *See id.* (quotation omitted); *see also* U.C.C. § 2-315 cmt. 2 (stating a particular purpose is "a specific use by the buyer which is peculiar to the nature of his business," and "differs from the ordinary purpose for which the goods are used.").

Consistent with this distinction, courts require allegations that the seller knew of a particular purpose beyond ordinary use and that the buyer relied on the seller's skill or judgment. *See Nowell*, 372 F. Supp. at 1257–58.

The FAC also fails to plausibly plead the second required element of a fitness for a particular purpose claim: reliance. The FAC does not allege that Plaintiff or his physician relied on Nevro's skill or judgment in selecting the device. The FAC asserts that Plaintiff and his physician relied on Nevro to provide goods manufactured in accordance with FDA specifications. *See* FAC ¶¶ 186, 193. Taken as pled, the FAC frames the issue as one of regulatory compliance rather than reliance on Nevro's skill or judgment in selecting a suitable device for a particular purpose. Moreover, the FAC alleges that Plaintiff's treating physician performed the implantation, not that Nevro selected the device. *See* FAC ¶ 77. The FAC contains no factual allegations that Nevro participated in the device-selection decision, made individualized recommendations, or otherwise induced reliance by Plaintiff's physician.

Because the FAC alleges no deviation from FDA-approved specifications and does not plausibly plead the elements of a claim for the breach of either implied warranty, Plaintiff's implied-warranty claims are both preempted and inadequately pled.

Accordingly, Count II is dismissed without prejudice.

## IV.    Count III – Failure to Warn

Plaintiff's failure-to-warn claim similarly does not fit within the narrow gap left open by the MDA. In Count III, Plaintiff alleges generally that Nevro failed to provide adequate warnings to his physician, in any form, regarding the risks associated with the SCS System. FAC ¶¶ 195–204. He claims Nevro did not provide the FDA-approved labeling or otherwise warn through package inserts, brochures, or sales representatives, leaving his physician unable to advise him of

foreseeable risks. *Id.* ¶ 199. Elsewhere in the FAC, Plaintiff identifies the risks he believes required warnings—vagus nerve overstimulation, syncopal episodes, and fecal incontinence. *Id.* ¶¶ 55, 79, 83. Nevro emphasizes these same risks in its motion to dismiss, arguing that the FDA-approved labeling contains no warnings about them. Def.'s Mot. to Dismiss at 9–11.

As explained above, the Court takes judicial notice only of the existence of the FDA-approved labeling for Nevro's SCS device, which is publicly available on the FDA's website, but not the truth of any statements or medical assertions within the labeling. *See, e.g., Nowell*, 372 F. Supp. 3d at 1207–08; *Oliver*, 2021 WL 4171574, at \*2; *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006). The Court relies on the labeling here only to identify which warnings appear and which do not.

The FDA-approved labeling includes warnings regarding electromagnetic interference (EMI), operation of vehicles while stimulation is on, charging-related burns, and contraindications for certain medical procedures including MRI, CT scans, diathermy, lithotripsy, and radiation. *See* U.S. Food & Drug Admin., *Nevro Patient Manual*, at 8–14 (Jan. 16, 2015), https://www.accessdata.fda.gov/cdrh_docs/pdf13/P130022C.pdf; *see also* U.S. Food & Drug Admin., *Nevro Physician Implant Manual*, at 7–10 (Jan. 16, 2015), https://www.accessdata.fda.gov/cdrh_docs/pdf13/P130022D.pdf. The FDA-approved labeling does not include warnings concerning vagus nerve overstimulation, syncopal episodes, or fecal incontinence.

This case aligns closely with *Caplinger*, in which the Tenth Circuit dismissed failure-to-warn claims because the plaintiff failed to identify any parallel federal duty requiring the warnings she sought. *See Caplinger*, 784 F.3d at 1341. The FDA-approved label did not contain the warnings at issue, and the court emphasized that once a device has undergone the

18

rigorous PMA process, state law cannot impose additional or different labeling obligations. *Id.* at 1345–46. The court rejected attempts to rely on general provisions such as 21 U.S.C. § 352 or 21 C.F.R. § 801.5, explaining that those provisions did not create a viable parallel duty for prescription devices whose labeling had already been approved by FDA. *Id.* at 1341. It further held that allowing state tort law to require warnings beyond those FDA mandated would "disrupt[] the federal scheme" by compelling manufacturers to alter labels they are legally prohibited from changing without FDA approval. *Id.* at 1341, 1345.

The same reasoning applies here. Plaintiff has not identified any FDA requirement mandating warnings about vagus nerve overstimulation, syncopal episodes, or fecal incontinence. The FDA-approved labeling for Nevro's SCS device contains warnings about EMI, driving restrictions, charging-related burns, and contraindicated medical procedures, but it does not include the risks Plaintiff alleges. *See* U.S. Food & Drug Admin., *Nevro Patient Manual*, at 8–14 (Jan. 16, 2015), https://www.accessdata.fda.gov/cdrh_docs/pdf13/P130022C.pdf; *see also* U.S. Food & Drug Admin., *Nevro Physician Implant Manual*, at 7–10 (Jan. 16, 2015), https://www.accessdata.fda.gov/cdrh_docs/pdf13/P130022D.pdf; *see also* FAC ¶¶ 55, 79, 83, 199. As in *Caplinger*, Plaintiff thus seeks to impose duties "different from, or in addition to" federal requirements, and the claim is expressly preempted under § 360k(a). Allowing such a claim to proceed would invite precisely the kind of state-law interference with FDA labeling determinations that Congress sought to bar, creating obligations that could undermine medical device regulation.

Plaintiff attempts to frame his claim as parallel by citing § 352's prohibition on false or misleading labeling and New Mexico's duty to warn physicians of foreseeable risks. *See* Pl.'s Resp. at 10. He presents this in a table format:

19

> **Federal Requirement:** Refrain from promulgating product labeling which is false or misleading in any particular [sic].
>
> **State Requirement:** Provide adequate warnings of foreseeable risks to a learned intermediary.

*Id.* This argument mirrors the one rejected in *Caplinger*. There, the plaintiff likewise relied on 21 U.S.C. § 352 and 21 C.F.R. § 801.5 as a supposed parallel duty, but the Tenth Circuit explained that those provisions govern labeling in a general sense, while her state law claims swept far more broadly, attacking advertising and oral representations. *See Caplinger*, 784 F.3d at 1341–42. Because the scope of the plaintiff's state law claims exceeded the scope of the federal provisions she cited, they were not truly parallel. *Id.* at 1341.

The same mismatch exists here. Section 352 prohibits false or misleading labeling, but even taking New Mexico law as Plaintiff frames it, *see* Pl.'s Resp. at 10, the state-law duty he identifies—to provide adequate warnings of foreseeable risks to a learned intermediary—sweeps more broadly than § 352 and would require warnings about risks the FDA did not require. Plaintiff's state law duty thus substantially exceeds the scope of § 352, demanding warnings about risks the FDA did not require. *See, e.g., Caplinger*, 784 F.3d at 1341 (plaintiff's cited federal regulations "govern only a device's labeling" while her state law claims "go well beyond that"). As the court in *Caplinger* found, once the FDA approves a label, manufacturers cannot alter it without agency approval, and state law cannot impose additional duties to warn of risks the FDA did not recognize. *See id.* at 1342–43, 1345–46.

Further, Plaintiff cites *Nowell* not for its holding, but to illustrate a potential state-law duty—the obligation to provide adequate warnings to a learned intermediary. *See* Pl.'s Resp. at 10. But *Nowell* did not recognize a broad duty to warn of all foreseeable risks. Instead, the court applied the learned-intermediary doctrine and required the plaintiff to allege specific defects in the

20

warnings and facts showing her physician would have acted differently had adequate warnings been given. *Nowell*, 372 F. Supp. at 1250–51. The court found her allegations too generalized and dismissed the claim because she had not identified particular statements that were inadequate or shown that her doctor lacked awareness of the risks. *Id.* at 1255–56. By contrast, Plaintiff here pairs § 352's general prohibition on false or misleading labeling with a sweeping state duty to warn of foreseeable risks, without pointing to any specific FDA requirement requiring the warnings he seeks. *See Caplinger*, 784 F.3d at 1341. That mismatch mirrors the defect identified in *Caplinger* in which the scope of the state duty substantially exceeds the scope of the federal provision, so the claim is not truly parallel and is preempted. *See id.* at 1341–42.

The Court acknowledges that in some cases, factual uncertainty about the scope of FDA requirements may preclude dismissal at the pleading stage. *See Bausch v. Stryker Corp.*, 630 F.3d 546, 560–61 (7th Cir. 2010) (finding that dismissal was premature where plaintiffs lacked access to confidential PMA specifications and could not plead more detail without discovery). But Plaintiff has not suggested any such uncertainty. He has not argued that he lacks access to FDA materials, nor identified any missing fact essential to analyzing preemption. Instead, he relies on general allegations that Nevro's labeling was inadequate under New Mexico law. In these circumstances, as in *Caplinger*, dismissal is appropriate because Plaintiff has failed to identify any viable parallel federal duty.

Accordingly, Plaintiff's failure-to-warn claim is preempted and inadequately pled. Count III is dismissed without prejudice.

## V.    Count IV – Negligence

In Count IV, Plaintiff alleges that Nevro's violations of federal manufacturing regulations proximately caused his injuries. *See* FAC ¶¶ 205–13. He asserts Nevro owed him a duty to

manufacture the HFX implants in compliance with FDA specifications and breached that duty by failing to conduct quality audits, perform risk analyses, monitor validated processes, investigate nonconformities, and correct quality problems. *Id.* ¶¶ 206–07 (citing 21 C.F.R. §§ 820.22, 820.30(g), 820.70(a), 820.75(b), 820.100(a)(2)–(3)). Plaintiff alleges these failures proximately caused his injuries. *Id.* ¶ 208. He further asserts that his negligence claim "parallels" FDA requirements and does not add to or change them. *Id.* ¶¶ 209, 212–13.

Nevro argues in its motion to dismiss that Count IV is inadequately pled and, in the alternative, preempted. *See* Def.'s Mot. to Dismiss at 14. Plaintiff's response brief did not address this argument at all, effectively conceding the point. *See* Pl.'s Resp. Nevro highlights this omission in its reply. *See* Def.'s Reply at 6.

Plaintiff's allegations, if adequately supported by the facts, could in theory state a parallel negligence claim. However, Plaintiff fails to connect any specific regulatory violation to his injuries. Plaintiff recites regulatory provisions and asserts proximate cause, but he offers no factual details showing *how* any specific violation resulted in vagus nerve overstimulation, the basis of his injuries. Under *Twombly* and *Iqbal*, such formulaic recitations are insufficient to state a plausible claim. *See Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678. In *Nowell*, the court found that conclusory recitations of regulatory duties and proximate cause fail where the complaint does not allege facts connecting any violation to the plaintiff's injuries. *See Nowell*, 372 F. Supp. 3d at 1246–48. Here, Plaintiff's FAC suffers from the same defect and therefore does not plausibly state a negligence claim. And because Plaintiff did not address Nevro's arguments in his response brief, the claim is effectively conceded. *See, e.g.*, *Rock Roofing, LLC v. Travelers Cas. & Sur. Co.*, 413 F. Supp. 3d 1122, 1128 (D.N.M. 2019) (finding that plaintiff's failure to respond to defendant's argument waived the issue); *San Miguel Hosp. Corp. v. Publix Supermarket, Inc.*, No. 1:23-cv-

22

0903 KWR/JFR, 2025 WL 872972, at *11 (D.N.M. Mar. 19, 2025) (treating an argument as conceded where the plaintiff failed to respond to the defendant's challenge).

Accordingly, Count IV is dismissed without prejudice.  Because the Court dismisses Count IV on pleading grounds, it need not and does not reach Defendant's alternative argument that the claim is preempted under 21 U.S.C. § 360k(a).

### VI.     Count V – Fraudulent Misrepresentation

In Count V, Plaintiff alleges that Nevro, through its representative, Ms. Ferguson, made five material misrepresentations during direct marketing:

> I. That the pain relief results from a permanent IPG implant would be equal to or better than those achieved in the Trial Stimulation period;
>
> II. That the permanent HFX would permanently deliver substantial pain relief;
>
> III. That Plaintiff would be able to resume normal activities of daily living following implantation of the permanent HFX IPG;
>
> IV. That she and Nevro's other representatives would be readily available to Plaintiff for the purpose of adjusting device settings to optimize pain relief;
>
> V. That Nevro's sales reps have the medical knowledge and training necessary to make purposeful, effective adjustments to the HFX device settings to achieve adequate pain relief[.]

FAC ¶ 75.  Plaintiff asserts that these statements were knowingly false or reckless and induced him to undergo implantation of Nevro's device.  *Id.* ¶¶ 219–21.

Count V fails, because the challenged statements are forward-looking assurances rather than actionable misrepresentations of present fact, and because the FAC does not plead falsity, present intent to deceive, or proximate causation with the particularity Federal Rule of Civil Procedure 9(b) requires.  Nevro argues—and the Court agrees—that the first four of the five statements are promises of future performance, not present facts, and that the FAC alleges no facts showing they were made with a present intent not to perform.  *See* Def.'s Mot. to Dismiss at 15–

23

16. Nevro further argues that the fifth statement—that its representatives possessed the medical knowledge and training necessary to adjust the device—also fails because the FAC alleges no facts showing that representation was false. *See id.* at 15.

Under New Mexico law, a claim for fraudulent misrepresentation requires: "(1) a misrepresentation of fact, (2) either knowledge of the falsity of the representation or recklessness on the part of the party making the misrepresentation, (3) intent to deceive and to induce reliance on the misrepresentation, and (4) detrimental reliance on the misrepresentation." *Pedroza v. Lomas Auto Mall, Inc.*, 600 F. Supp. 2d 1162, 1167 (D.N.M. 2009) (quoting *Cain v. Champion Window Co. of Albuquerque, LLC*, 164 P.3d 90, 97 (N.M. Ct. App. 2007)); *see also* UJI 13-1633 NMRA. "Fraudulent '[i]ntent may be inferred from the circumstances surrounding the dealings . . . .'" *Pedroza*, 600 F. Supp. 2d at 1167 (quoting *Maxey v. Quintana*, 499 P.2d 356, 360 (N.M. Ct. App. 1972)). The party asserting fraud must prove each of these elements by clear and convincing evidence. *See* UJI 13-1633 NMRA. "[T]o recover in fraud, Plaintiff[] must establish that [he] suffered damages that were proximately caused by justifiable reliance on [Nevro's] misrepresentation . . . ." *Cain*, 164 P.3d at 97 (citing *Williams v. Stewart*, 112 P.3d 281, 290 (N.M. Ct. App. 2005)). "[P]roximately caused damages are damages that are 'the direct and natural consequences of the reliance on a fraudulent representation.'" *Id.* at 98 (quoting *Williams*, 112 P.3d at 290).

Statements predicting permanent pain relief, equal or better outcomes, or resumption of normal activities are promises of future performance. *See Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1244 (10th Cir. 1990) (explaining that promises of future action are not actionable fraud absent evidence they were made with present intent not to perform). Under New Mexico law, such promises are not actionable as fraud absent allegations of present intent

24

not to perform.  *See Solomon v. Pendaries Props., Inc.*, 623 F.2d 602, 605 (10th Cir. 1980) (citing *Telman v. Galles*, 63 P.2d 1049, 1052 (N.M. 1936)).  In *Flight Concepts*, for example, the Tenth Circuit found no legal basis for a fraud claim based on assurances that the defendant would support and invest in a project, explaining that such promises of future performance are not actionable absent evidence they were made with a present intent not to perform.  *See Flight Concepts Ltd. P'ship v. Boeing Co.*, 38 F.3d 1152, 1156–57 (10th Cir. 1994).  The same rationale applies here. Plaintiff's allegations regarding statements I–IV amount to dissatisfaction with the device's performance and programming based on Nevro's future-oriented assurances, yet he pleads no facts showing those statements were false when made or accompanied by a present intent not to perform.

The allegation in statement V "[t]hat Nevro's sales reps have [necessary] medical knowledge and training . . ." is closer to a *present* fact.  *See* FAC ¶ 75.  However, the FAC does not allege how that representation was false—for example, by identifying a lack of training, specific errors, or any factual basis suggesting the statement was untrue when made.

Courts have also noted that promises are generally not considered false statements merely because the promise is ultimately not kept.  *See, e.g.*, *Caldera Pharms., Inc. v. Bellows*, No. 1:10-cv-0222 JH/RHS, 2012 WL 13005319, at *6 (D.N.M. Dec. 21, 2012) ("[A] promise to take certain action in the future does not become fraudulent simply because the promise is subsequently not honored."); *Whitlock Packaging Corp. v. Stearns*, 2015 WL 1598093, at *11 (D. Colo. Apr. 9, 2015) ("An unfulfilled promise is not fraud absent proof in the record that a promise to perform was made with the intent not to keep the promise").

Plaintiff invokes the *Telman* exception—an exception to the general rule that promises of future performance are not actionable as fraud.  *See* Pl.'s Resp. at 12–13.  In *Telman*, the court held that a plaintiff may pursue a fraud claim based on a future-oriented promise if substantial

25

evidence exists to prove facts showing the defendant made the promise with an actual, present intent to deceive. *See Telman*, 63 P.2d at 1052. Plaintiff argues that even if the challenged statements are construed as forward-looking assurances, they fall within this exception because Nevro allegedly made them with fraudulent intent. *See* Pl.'s Resp. at 12–13. But the FAC alleges no facts supporting a present intent to deceive. The party alleging fraud must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Plaintiff's pleading does not meet that standard. Nor does the FAC plausibly allege causation, as Plaintiff attributes his injuries to vagus nerve overstimulation, not to any failure of the device to deliver pain relief or of representatives to provide support. *See* FAC ¶¶ 52–56, 175–79.

Because Plaintiff has not pled falsity, intent, or causation with the particularity Rule 9(b) requires, Count V is dismissed without prejudice.

## VII.   Count VI – Breach of Express Warranties

In Count VI, Plaintiff alleges that Nevro expressly warranted the safety and effectiveness of its HFX device, as well as specific outcomes such as permanent pain relief, resumption of normal activities, and ongoing support from trained representatives. *See* FAC ¶¶ 224–25. He further alleges the device did not conform to these representations, caused severe injury, and failed to deliver the promised results. *Id.* ¶¶ 226–27.

Nevro moves to dismiss, arguing that the alleged warranties are either non-actionable promises of future performance or conclusory assertions of safety and efficacy. Def.'s Mot. to Dismiss at 18–19. Nevro further contends that Plaintiff pleads no facts showing breach: he does not allege that the device failed to provide the same pain relief as the trial stimulator, that he was unable to resume daily activities, that representatives were unavailable, or that they lacked training. Def.'s Reply at 10–11. Plaintiff's response does not substantively address these points but instead

26

refers back to his fraud arguments and repeats that the device "did not deliver the claimed results." Pl.'s Resp. at 11–13, 14–15.

Under New Mexico law, a seller expressly warrants goods in a commercial transaction when it (i) makes an affirmation of fact or promise to the buyer "which relates to the goods and becomes part of the basis of the bargain"; (ii) describes the goods in a way that "is made part of the basis of the bargain"; or (iii) provides a "sample or model which is made part of the basis of the bargain." N.M. Stat. Ann. § 55-2-313. "If the goods provided are not as warranted, the goods are in breach of warranty." *Badilla v. Wal-Mart Stores E. Inc.*, 357 P.3d 936, 941 (N.M. 2015). "A breach of warranty presents an objective claim that the goods do not conform to a promise, affirmation, or description." *Id.* (quotation omitted). "A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach." *Id.*.

Applying these standards, Plaintiff's allegations fall into two categories: (a) safety and effectiveness warranties, and (b) future performance and service warranties. Neither is adequately pled.

a.    Safety and Effectiveness Warranties

Plaintiff alleges in conclusory fashion that Nevro warranted the device was "safe and fit for use by consumers, was of merchantable quality, did not produce dangerous side effects, and was adequately tested." FAC ¶ 224. He pleads no facts showing who made these statements, when they were made, or how they became part of the basis of the bargain. *See* N.M. Stat. Ann. § 55-2-313. Plaintiff does not defend this aspect of his claim in response. *See* Pl.'s Resp. at 14–15, 11–13. As such, these allegations fail. *See Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678.

b.        Future Performance and Service Warranties

Plaintiff also alleges that Nevro, through Ms. Ferguson, warranted that the permanent implant would provide pain relief equal to or better than the trial stimulator, permanently relieve pain, allow resumption of normal activities, and be supported by trained representatives. FAC ¶¶ 71–75, 225. Plaintiff identifies the circumstances of these alleged statements, such as *who* made them (Ms. Ferguson), *when* (March 2021, after the trial period and before the permanent implant), and to *whom* (Plaintiff), and he further alleges that the device ultimately caused him pain and had to be removed. *Id.* ¶¶ 73, 75.

Those allegations, however, do not plausibly connect his injuries to the *specific* warranties alleged. The warranties identified by Plaintiff concern discrete promised outcomes—for example, that the permanent implant would provide pain relief at least equal to that achieved during the trial stimulator, permanently provide substantial pain relief, allow resumption of normal activities, and be supported by trained Nevro representatives. *See id.* ¶ 225.

An express warranty claim requires factual allegations that the goods failed to conform to one of those particular affirmations or descriptions. *See Badilla*, 357 P.3d at 941; N.M. Stat. Ann. § 55-2-313. Yet the FAC does not supply that link.

The FAC does not plead facts showing that the permanent implant provided less pain relief than the trial device, that Plaintiff was unable to resume daily activities, that representatives were unavailable, or that they lacked training. Instead, Plaintiff alleges only that the device was "not reasonably safe," caused "numerous serious side effects," resulted in "severe and permanent injury," and "did not deliver the claimed results." *Id.* ¶ 226. These are generalized assertions of product failure, not factual allegations that the device failed to conform to any particular affirmation, promise, or description that formed the basis of the bargain.

28

The FAC also fails to identify *how* any of the adverse outcomes correspond to Nevro's failure to meet those specific promises, *id.* ¶ 225.  For example, alleging that the device caused side effects does not show that it provided less pain relief than the trial stimulator; alleging permanent injury does not show that Plaintiff was unable to resume daily activities; and alleging that the device was unsafe does not show that Nevro's representatives were unavailable or untrained.  These allegations describe adverse outcomes, but they do not describe nonconformity to any particular warranty that formed the basis of the bargain.  Accordingly, such general allegations are insufficient to show that the goods failed to conform to any particular promise or description.  *See Twombly*, 550 U.S. at 570; *Iqbal*, 556 U.S. at 678.

Because Plaintiff has not pled facts sufficient to plausibly allege breach of any express warranty, Count VI is dismissed without prejudice.

### VIII.    Count VII – Violation of the New Mexico Unfair Practices Act

The New Mexico Unfair Practices Act ("NMUPA") prohibits "[u]nfair or deceptive trade practices and unconscionable trade practices."  N.M. Stat.Ann. § 57-12-3 (1978).  "To state a claim under the UPA, a plaintiff must show that: (1) defendant made an oral or written statement that was either false or misleading; (2) the false or misleading representation was knowingly made in connection with the sale of goods or services; (3) the conduct complained of occurred in the regular course of defendant's business; and (4) the representation may, tends to, or does deceive or mislead any person."  *Mulford v. Altria Grp., Inc.*, 242 F.R.D. 615, 621 (D.N.M. 2007) (citing *Brooks v. Norwest Corp.*, 103 P.3d 39, 51 (N.M. 2004)).

In Count VII, Plaintiff alleges that Nevro violated the NMUPA by knowingly making false or misleading representations in connection with the sale of its HFX device.  *See* FAC ¶¶ 234–38.  Nevro moves to dismiss, arguing the claim is inadequately pled because it merely recites statutory

elements without identifying any specific misrepresentation tied to the sale of goods.  Def.'s Mot. to Dismiss at 19; *see also* Def.'s Reply at 12.

Plaintiff, in response, appears to argue that Nevro's criticism misstates the scope of NMUPA.  *See* Pl.'s Resp. at 15.  He contends the statute encompasses sales of prescription medical devices.  *Id.*  He points to his allegation that Nevro knowingly sold nonconforming products "on the open market to consumers, including Plaintiff," as evidence that the claim arises from a commercial transaction.  *Id.* (citing FAC ¶ 138).  In Plaintiff's view, Nevro's argument that the FAC fails to connect the conduct to a sale is unfounded.  *Id.*

The Court agrees with Nevro. Plaintiff's allegations offer little more than a barebones recitation of the elements of a NMUPA claim.  While the FAC does contain some allegations of specific misrepresentations, *see, e.g.*, FAC ¶ 75, Count VII does not identify which of those statements, or any from the FAC, form the basis of the NMUPA claim or explain how they satisfy the statutory elements.  Instead, Plaintiff relies on incorporation by reference, leaving the Court to piece together the claim along with a bare recital of the statute.  Rule 8(a) requires that plaintiffs provide a short and plain statement showing they are entitled to relief. Fed. R. Civ. P. 8(a)(1). Merely incorporating prior allegations without specifying the misrepresentation at issue does not satisfy Rule 8's pleading standard.  *See Twombly*, 550 U.S. at 555 (requiring factual allegations sufficient to raise a right to relief above the speculative level).  Without factual detail linking a particular misrepresentation to the sale of the device under NMUPA, the claim remains too conclusory.  *See Iqbal*, 556 U.S. at 678 (holding that legal conclusions couched as factual allegations are insufficient).

Because Count VII does not identify any specific misrepresentation that forms the basis of the NMUPA claim or explain how such a statement was made in connection with the sale of the

device, the allegations remain too conclusory to satisfy Federal Rule of Civil Procedure 8. Plaintiff's reliance on incorporation by reference and recitation of statutory elements does not cure the absence of factual detail linking a particular representation to the sale of goods. Accordingly, Count VII fails to state a plausible claim and is dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, Defendant Nevro Corporation's Motion to Dismiss, Doc. 16, is **GRANTED** and Plaintiff's claims are **DISMISSED WITHOUT PREJUDICE**.

The Court will allow Plaintiff the opportunity, if he can do so consistent with Federal Rule of Civil Procedure 11, to move to amend the complaint to allege facts sufficient to support his claims. Plaintiff may file any such motion no later than **thirty days** from entry of this order. If no motion is filed, the Court will dismiss this case.

**IT IS SO ORDERED.**

**SARAH M. DAVENPORT**
**UNITED STATES DISTRICT JUDGE**